UNITED MINE WORKERS OF AMERICA INTERNATIONAL UNION, by Thomas RABBIT, Trustee ad litem; District 4, United Mine Workers of America, Plaintiffs,

v.

Max NOBEL, et al., Defendants.

BOARD OF TRUSTEES OF the UNITED MINE WORKERS OF AMERICA 1974 BENEFIT PLAN AND TRUST, et al., Plaintiffs,

v.

INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, et al., Defendants.

INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, et al., Plaintiffs,

v.

UNITED MINE WORKERS OF AMERICA 1974 BENEFIT PLAN AND TRUST, et al., Defendants. (Two Cases)

Civ. A. Nos. 86–2638, 88–0545, 88–0546 and 88–1842.

United States District Court, W.D. Pennsylvania.

Aug. 3, 1989.

As Amended Aug. 29, 1989.

Michael J. Healey, Pittsburgh, Pa., Michael H. Holland, Washington, D.C., John Purcell, Bradley Pyles, and Thomas M. Meyers, for plaintiffs.

H. Yale Gutnick, Pittsburgh, Pa., and Stanley F. Lechner, Washington, D.C., for plaintiff intervener.

Marshall J. Conn, Pittsburgh, Pa., Thomas A. Bowlen, Uniontown, Pa., William F. Hanrahan, and Robert M. Weinberg, Washington, D.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ZIEGLER, District Judge.

The instant case presents a straight-forward factual dispute. We are required to determine whether the Bituminous Coal Operators Association agreed to fund the health care costs and other non-pension benefits of pensioners of eight former signatory employers to various National Bituminous Coal Wage Agreements. After consideration of the language of the contracts, the structure, bargaining history, and the direct and circumstantial evidence of record concerning the intent of the parties, we hold the evidence preponderates that the BCOA agreed to fund the health benefits of the individual plaintiffs for the term of the agreement to gain acceptance of the National Bituminous Coal Wage Agreement of 1988 by the United Mine Workers of America. We further hold that the decision of the Trustees of the 1974 Benefit Plan to deny benefits to the individual plaintiffs was arbitrary and capricious, and that the Trustees are precluded from re-litigating in this court the definition of "no longer in business" which was resolved in *District 29, UMWA v. UMWA 1974 Benefit Plan and Trust*, 826 F.2d 280 (4th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988). The 1974 Benefit Plan is required to provide health care and other non-pension benefits where, as here, a retiree's last signatory employer is no longer a signatory to the National Bituminous Coal Wage Agreement. Judgment will be entered for the International Union, United Mine Workers of America, Districts 2, 4, 5 and 6, the individual plaintiffs and the class, against the Bituminous Coal Operators' Association, Inc. and the United Mine Workers of America 1974 Benefit Plan and Trust.

(1) The individual plaintiffs at civil action Nos. 86–2638, 88–546 and 88–1842, and the individual defendants at No. 88–545, are retired or disabled coal miners, surviving spouses or dependents of retired or disabled coal miners, who were last employed in the coal industry by Barnes & Tucker Coal Company, Y & O Coal Company, Menallen Coal Company, G.M. & W. Coal Company, Marmon Coal Company, Penn Pocahontas Coal Company, Canterbury Coal Company or Coalite, Inc.

(2) The United Mine Workers of America International Union, Districts 2, 4, 5 and 6, and Local 1313, United Mine Workers of America, are labor organizations within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5). These organizations were the collective bargaining representatives of the employees of the eight employers in dispute.

(3) The Bituminous Coal Operators' Association, Inc. (BCOA) is a multi-employer bargaining association that currently represents approximately 16 companies in collective bargaining with the United Mine Workers of America (UMWA). The BCOA and the UMWA negotiate the National Bituminous Coal Wage Agreement (NBCWA), a collective bargaining agreement that governs the terms and conditions of employment for the coal miners of the BCOA-member companies and companies that sign "me too" agreements with the UMWA.

(4) The BCOA has for approximately 40 years negotiated the national agreement with the UMWA. National Bituminous Coal Wage Agreements were executed in 1950, 1971, 1974, 1978, 1981, 1984 and 1988.

(5) The UMWA 1974 Benefit Plan and Trust is an employee welfare benefit plan within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1002(1). The plan is an irrevocable trust created, perpetuated and funded pursuant to the National Bituminous Wage Agreements of 1974, 1978, 1981, 1984 and 1988. In general, the 1974 Benefit Plan provides health and other non-pension benefits to miners who retired after January 1, 1976 and who meet certain eligibility criteria.

(6) Jurisdiction is based on the Employee Retirement Income Security Act, 29 U.S.C. § 1132, Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and 28 U.S.C. § 1331. Venue properly lies with this court under 29 U.S.C. § 1132(e)(2) and the parties do not contend otherwise.

(7) The International Union, Districts, Local 1313, and the individual plaintiffs, who are or were vested in a pension under the 1974 Pension Plan and the spouses or dependents of such persons, seek injunctive relief to compel the 1974 Benefit Plan to provide health and other non-pension benefits, pay all unpaid medical bills and establish an escrow fund to insure payment of such benefits. In seeking equitable relief, plaintiffs bear the burden of proving by a preponderance of the evidence (a) success on the merits, (b) irreparable harm, (c) defendants will not suffer substantial harm from the grant of an injunction and (d) the public interest, if any. The parties stipulated that the instant proceeding shall constitute a trial on the merits pursuant to Rule 65(a)(2).

(8) Plaintiffs contend that the individual plaintiffs, who are retired or disabled miners (or their dependents), were last employed as coal miners for one of eight former signatory employers to various National Bituminous Coal Wage Agreements. The wage agreements from 1974 to the present guaranteed health and non-pension benefits to all pensioners for life when benefits were not paid by their last employer. When the eight employers failed to execute the NBCWA, the BCOA agreed to fund the benefits of the plaintiffs for the period of the 1988 agreement to prevent cessation of benefits because their former employers were no longer legally obligated to do so. Further, plaintiffs contend that the decision of the 1974 Benefit Plan to deny benefits to the individual plaintiffs was arbitrary and capricious because the Trustees (a) misconstrued the intent of the UMWA and the BCOA; (b) improperly interpreted the plan and trust documents; and (c) failed to enforce various contractual provisions to require the BCOA to fund the benefits. Finally, plaintiffs argue that the 1974 Benefit Plan is precluded from litigating in this court the phrase "no longer in business" of Article XX of the National Bituminous Coal Wage Agreements and Article IIE.4. of the 1974 Benefit Plan and Trust following the decision in *District 29, United Mine Workers of America v. 1974 Benefit Plan & Trust*, 826 F.2d 280 (4th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988).

(9) Article XX(c)(3)(ii) of the National Bituminous Coal Wage Agreement of 1988 provides as follows:

> For purposes of determining eligibility under the 1974 Benefit Plan and Trust, an Employer is considered to be "no longer in business" only if the Employer:
>
> (a) has ceased all mining operations and has ceased employing persons under this Wage Agreement with no reasonable expectation that such operations will start up again; and
>
> (b) is financially unable (through either the business entity that has ceased operations as described in subparagraph (a) above, including such company's successors or assigns, if any, or any other related division, subsidiary, or parent corporation, regardless of whether covered by this Wage Agreement or not to provide health and other non-pension benefits to its retired miners and surviving spouses.

Article IIE.4. of the 1974 Benefit Plan and Trust contains the eligibility test which refers to Article XX of the 1978, 1981 or 1984 wage agreements.

(10) The 1974 Benefit Plan filed a civil action for a declaratory judgment to determine

whether plaintiffs are responsible for providing health benefits to members of the Class under the Plan where they fail to satisfy the eligibility requirement for benefits under Article II of the Plan document in effect on and after June 7, 1981, because their last signatory employers do not satisfy the definition of 'no longer in business' set forth in the Plan document.

(11) The BCOA intervened and filed a complaint in the action filed by the Trustees of the 1974 Benefit Plan contending that (a) a class is properly certifiable under Rule 23(b)(2); and (b) each last signatory employer of the individual employees, since June 7, 1981, possessed one or more of the following characteristics:

(i) it continues or continued to engage in the business of mining coal; or

(ii) it continues to employ persons under wage agreements similar to the NBCWA; or

(iii) it has temporarily ceased coal mining operations with a reasonable expectation that such operations will resume; or

(iv) it is financially able to provide to pensioners the health benefits specified in the NBCWA (or similar agreement) to which it was signatory, or has a related division, parent or subsidiary corporation or successor or assign which is financially able to do so.

(12) The eight employers of the individual plaintiffs were signatories to a national agreement. Menallen Coal Company, G.M. & W. Coal Company, Marmon Coal Company, Penn Pocahontas Coal Company, Canterbury Coal Company and Coalite, Inc., were last signatories to the 1981 Agreement. Barnes & Tucker Coal Company and Y & O Coal Company were last signatories to the 1984 Agreement.

(13) Menallen ceased providing health benefits to its pensioners on October 1, 1985, Canterbury on August 5, 1985, G.M. & W., Penn Pocahontas and Marmon in April 1987, and Barnes and Tucker and Y & O on January 31, 1988. All of these employers, except Canterbury, have been assessed withdrawal liability by the UMWA Health and Retirement Funds based on the fact that they are no longer signatories to a collective bargaining agreement with the UMWA and are no longer obligated to contribute to the pension plans.

(14) The National Bituminous Coal Wage Agreement of 1950 established a trust known as the "United Mine Workers Welfare and Retirement Fund of 1950" for the purpose of providing health care and retirement benefits to members of the United Mine Workers, including active and retired miners and their dependents. The trust was the successor to an earlier health and welfare fund established in 1947 during negotiations between the United Mine Workers and the Secretary of the Interior.

(15) The Welfare and Retirement Fund of 1950 was governed by a board of three trustees, one appointed by the union, one by the BCOA, and one neutral trustee. It was funded by a royalty on the tonnage of coal produced or purchased by signatory employers. Between 1950 and 1974, the nature and level of benefits provided to active and retired mine workers was determined by the trustees of the 1950 Fund, who had complete discretion to determine the level of benefits and eligibility requirements. The trustees acted by means of formal resolutions. Pension benefits for retired miners were provided beginning in 1947, under the previous trust, and health benefits were provided to retired miners beginning no later than 1950. The pension and health benefits for retired miners were provided throughout the life of the miner. The eligibility of the retired miner to receive pension and health benefits from the 1950 Fund was not affected by whether the last employer ceased operations, went out of business, or failed to become signatory to successor agreements.

(16) In 1974, the UMWA and the BCOA agreed to restructure the trust to comply with ERISA, place the trust on a more sound financial basis, and permit more generous pensions based upon length of service for future retirees. The National Bituminous Coal Wage Agreement of 1974 re-

placed the 1950 Fund with four separate trusts. The 1950 Pension Plan and Trust and the 1950 Benefit Plan and Trust continued to provide pensions and health benefits to pensioners, dependents, and disabled mine workers who retired prior to January 1, 1976. The 1974 Pension Plan and Trust was to provide pension benefits to miners who retired after January 1, 1976, and the 1974 Benefit Plan and Trust was to provide health benefits and other non-pension benefits (including life insurance) to active mine workers and retirees who were receiving pensions from the 1974 Pension Plan and Trust.

(17) The UNWA and the BCOA also agreed during the course of the 1974 negotiations to extend lifetime health benefits to widows of retired mine workers, including the widows of miners who died prior to the 1974 Agreement, but did not extend lifetime benefits to a smaller group of widows of mine workers who had been working at the time of their death, although they were pension-eligible. *See United Mine Workers Health and Retirement Funds v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982).

(18) For the first time, the parties to the 1974 Agreement also agreed to define and set forth in the collective bargaining agreement the benefits to be provided to miners, pensioners, and their dependents. The parties negotiated the level of benefits and the eligibility requirements for those benefits. The benefits to be provided were summarized and placed in the agreement by including in Article XX a "Summary of Principal Provisions, UMWA Health and Retirement Benefits." The Article provided that, with respect to retired miners under both the 1950 Pension Plan and the 1974 Pension Plan, the retired miner would retain a health Services card "until death" and a widow would retain a card until her death or remarriage. "Any pensioned miner covered in this Plan will retain his Health services card until death, and upon his death his widow will retain a Health Services card until her death or remarriage." In addition, "a miner who was permanently disabled as the result of a mine accident after May 29, 1946 ... will be entitled to

retain his Health Services card for life. Upon his death, his widow will retain a Health Services card until her death or remarriage." *See* NBCWA of 1974, Article XX, Health and Retirement Benefits, ¶¶ 1 and 5, pp. 31–32.

(19) In 1977, the trusts experienced financial difficulty due to insufficient income, wildcat strikes, and increased costs for health care, and the trustees instituted a system of co-payments for health benefits, which continued until the expiration of the 1974 Agreement. Health benefits were terminated in December, 1977, when the trusts were unable to pay benefits.

(20) The 1974 agreement expired and a national strike ensued from December 5, 1977 to March 27, 1978. Three tentative contracts were negotiated in February and March, 1978. The first was rejected by the bargaining council of the Union in February, 1978. The second was rejected by the members of the UMWA in a ratification vote in early March, and the third was ratified and signed on March 27. During the negotiations for the 1978 agreement, the BCOA proposed to provide health benefits to active miners and retirees in the 1974 Pension Plan through company-sponsored benefit plans, and eliminate the 1974 Benefit Plan. The UMWA sought the restoration of health benefits to previous levels and a guarantee of benefits to avoid future cuts or loss of benefits similar to those experienced in 1977. The Union also insisted that some provision be made to ensure that "orphaned" pensioners who would otherwise lose their benefits would be protected. The parties ultimately agreed that benefits would be provided to active miners and pensioners who retired under the 1974 Pension Plan by individual company plans, but that the 1974 Benefit Plan would be retained as a "safety net" for the purpose of providing benefits to pensioners who would otherwise lose their benefits. The agreement provided that the 1974 Benefit Plan would provide benefits to

> any retired miner under the 1974 Pension Plan ... who would otherwise cease to receive the health and other non-pension benefits provided herein because the sig-

natory Employer (including successors and assigns) is no longer in business. The term "no longer in business" was not defined. Also, there was no discussion or agreement that any pensioner or groups of pensioners who would have had coverage under the previous system for health benefits would be excluded from coverage under the new system being implemented.

(21) During the 1978 negotiations, in the process of redrafting the "General Description of Plan Benefits" contained in Article XX of the proposed agreement, the BCOA proposed to eliminate the language contained in the 1974 Agreement that pensioners and disabled miners would retain a health services card "until death" or "for life", and widows "until death or remarriage." The UMWA refused to agree to elimination of the language, and substantially similar language was inserted into the 1978 "General Description", providing that a 1974 pensioner

... will be entitled to retain his health services card for life. Upon his death, his widow will retain a Health Services card until her death or remarriage.

Substantially identical language appears eight times in the General Description of Plan benefits, describing the health benefit entitlement of various categories of pensioners, disabled miners, and surviving spouses, including retirees receiving pensions under the 1950 Pension Plan. The BCOA negotiators understood in 1978 that any contract that removed such language would not be ratified because the membership considered the health services card as a basic benefit. The "for life" language was carried forward without change in the 1981, 1984, and 1988 Agreements.

(22) In the 1978 Agreement, the 1974 Benefit Plan and Trust was funded by a royalty of two cents per hour paid by the signatory employers. All eight of the employers involved in this case were signatory to the 1978 Agreement and contributed royalties to the 1974 Benefit Plan. At least five of the eight were members of the BCOA at the time of the execution of the 1978 Agreement. The 1974 Benefit Plan accumulated a substantial surplus by the end of the 1978 Agreement, and no additional contributions were required by the signatory employers during the terms of the 1981 and 1984 agreements. The funds accumulated during the term of the 1978 Agreement were sufficient to provide benefits to all "orphaned" pensioners from 1978 to 1988.

(23) The 1978 Agreement required substantial change and redrafting of the plan documents to reflect the change in the delivery system of health care benefits. In order to implement the new system, each pensioner was assigned to his last signatory employer. In some cases, the last employer could not be identified or located. In an effort to ensure that no one would lose their benefits in the transition to the new delivery system, the parties provided that:

Notwithstanding the above, any Pensioner who was eligible for benefits under the 1974 Benefit Plan as a Pensioner on December 5, 1977, and who is not eligible for benefits under an individual employer benefit plan ... shall be eligible for such benefits, subject to all other provisions of this Plan.

Contrary to the assertion of the Fund and the BCOA, the settlors did not intend to create two classes of pensioners, i.e., those retiring before December 5, 1977 and those retiring at a later date, and provide a "safety net" for the former but not the latter. We note that the 1974 Benefit Plan has not applied such a test in these cases. The Plan has denied benefits to all pensioners of the eight employers regardless whether they retired before or after December 5, 1977.

(24) Following the 1978 Agreement, the Trustees denied coverage to certain groups of pensioners, among them pensioners from Imperial Coal Company, who were eligible for pensions but did not retire prior to December 5, 1977, and whose employers did not sign the 1978 Agreement. The union-appointed trustee dissented from the decision to deny benefits.

(25) During negotiations for the 1981 Agreement, the BCOA agreed to amendments to the benefit plan to extend benefits

to the Imperial pensioners that had been excluded by the interpretation of the Trustees. In those negotiations, the BCOA did not take the position that the Imperial pensioners were not covered in 1978. Roger Haynes, the primary benefits spokesman for the BCOA, conceded that they were intended to be covered in 1978 but "had fallen through a crack." The Union took the position that the Trustees had misinterpreted the intent of the parties.

(26) The Trustees of the UMWA Health and Retirement Funds promulgate written questions and answers to provide standardized responses to the terms of the plan and trust documents. Following the 1978 Agreement, the Trustees adopted Q & A H–16, which defined the terms "no longer in business" and "successor" contained in the agreement.

(27) By 1980, a number of signatory companies ceased operations as economic conditions in the coal industry worsened. The 1978 Agreement, while providing for orphaned pensioners, had failed to anticipate the problem of laid off miners whose last employer was no longer in business. In 1980, the parties entered into a mid-term agreement to allocate up to $2 million from the 1974 Benefit Plan to provide benefits to laid off miners in that situation. The BCOA was concerned that the definition of "no longer in business," adopted by the Trustees, was susceptible of manipulation by employers seeking to dump their obligations on the 1974 Benefit Plan, and proposed language in the $2 million fund agreement to protect the 1974 Benefit Plan from such tactics. The Union agreed to the proposal.

(28) Shortly after the 1980 Agreement, the Trustees applied the new definition in the case of Transport, Inc., where the employer requested that the 1974 Benefit Plan assume responsibility for its laid off employees although it was still signatory to the collective bargaining agreement, financially able to provide benefits, and actually providing benefits pending the decision of the Trustees. The Trustees held that Transport, Inc. was in business and re-

mained obligated to provide benefits to its pensioners.

(29) During the negotiations for the 1981 Agreement, the BCOA proposed incorporating the "no longer in business" language from the 1980 mid-term agreement into the 1981 Agreement. The BCOA negotiators assured the UMWA negotiators that it was not the intent of the proposed change to cause pensioners to lose their benefits, but only to make sure that "there wasn't any way that the irresponsible operators could walk away from their liability." The Union's negotiators accepted those assurances and had no objection to the proposal. The evidence preponderates that the parties intended to protect the 1974 Benefit Plan by insuring that responsible employers fulfilled their obligations to provide benefits, but there was no intent or agreement to create a gap in coverage where certain pensioners would lose benefits because neither the employer nor the 1974 Benefit Plan was obligated to provide them.

(30) Following the 1981 Agreement, the Trustees, over the dissent of Harrison Combs, again interpreted the "no longer in business" language to deny benefits to a group of pensioners that were last employed by Adam Eidemiller, Inc. The parties informed the Trustees that their decision was contrary to their intent and, upon insistence by the Trustees, adopted a formal amendment to the plan which had the effect of including those pensioners in the 1974 Benefit Plan.

(31) Prior to the negotiations for the 1984 Agreement, a panel of the Court of Appeals for the Fourth Circuit decided *District 17, UMWA v. Allied Corporation (Allied I)*, 735 F.2d 121 (4th Cir.1984), and construed the collective bargaining agreement and trust documents to limit the obligation of the employer to provide health benefits to the term of the contract, and placed the obligation on the 1974 Benefit Plan where the employer was no longer obligated to make such payments. At the time of the negotiations, the Allied pensioners were receiving benefits pursuant to court order pending *en banc* hearing by the Court of Appeals, and there were no other

groups of pensioners that were not receiving benefits from either the employer or the 1974 Benefit Plan.

(32) During the 1984 negotiations, both parties presented proposals in response to the *Allied* ruling. The BCOA proposed language that all pensioners of employers who sell their operations, without passing the obligation to the purchaser to provide benefits, would be ineligible for benefits from the 1974 Benefit Plan, thereby reversing a portion of the *Allied* ruling. The BCOA also proposed to eliminate the guarantee of benefits in the 1978 and 1981 agreements. The UMWA offered a proposal which would have clearly placed the obligation to provide benefits on the employer beyond the term of the contract, unless the employer passed the obligation to a successor, but also made clear that the benefits were vested lifetime benefits and that the 1974 Benefit Plan was ultimately responsible, if no other party was legally obligated to do so. A second UMWA proposal would have strengthened the notice and related provisions of the successorship clause. The BCOA rejected the Union's proposals because it agreed with that portion of *Allied* which held the obligation of the employer did not survive the expiration of the contract, but disagreed with the part of the decision that placed the obligation on the 1974 Benefit Plan. The BCOA also disagreed that the benefits were lifetime benefits. The Union rejected the BCOA proposals because they would have left pensioners without health benefits and would have removed the guarantee of benefits. Both proposals of the parties were withdrawn in the latter stages of the 1984 negotiations, and the "no longer in business" language remained unchanged, although the parties did agree to some additional language to address bankruptcy problems and to provide additional notice of transfers of assets where the successorship clause was implicated.

(33) During the term of the 1984 Agreement, a number of additional court decisions construed the "no longer in business" language and the other provisions of the collective bargaining agreement and plan documents. *District 29, UMWA v. Royal Coal Company (Royal I)*, 768 F.2d 588 (4th Cir.1985); *District 17, UMWA v. Allied Corporation (Allied II)*, 765 F.2d 412 (4th Cir.1985); *Box v. Coalite*, 643 F.Supp. 709 (N.D.Ala.1986), and reaffirmed the holding of *Allied I*, that is, the obligation of the employer to provide benefits does not survive the expiration of the contract.

(34) The Trustees of the Funds, in their capacity as trustees of the 1950 Benefit Plan, also serve as arbitrators of disputes between employers and beneficiaries regarding health benefits, and issue written opinions regarding such disputes. The Trustees have applied the decision in *Allied II* and *Royal I* nationally to such disputes, and have issued 49 decisions holding that the employer is not obligated to provide benefits after the expiration of the agreement. At least four of those decisions involved the employers in this case.

(35) Three other courts construed the language in the contract and plan documents and placed the obligation to provide benefits on the 1974 Benefit Plan. *District 29, UMWA v. UMWA 1974 Benefit Plan and Trust (Royal II)*, 826 F.2d 280 (4th Cir.1987); *Schifano v. UMWA 1974 Benefit Plan and Trust*, 655 F.Supp. 200 (N.D. W.Va.1987); *Crockett v. Vecellio & Grogan*, 1987 WL 60303 88–1448 (S.D.W.Va. Feb. 4, 1987).

(36) At the time of the negotiations leading to the 1988 Agreement, both parties were aware of these holdings and the construction that the courts had placed on the provisions of the contract and benefit plans. The Court of Appeals for the Fourth Circuit had denied the 1974 Benefit Plan's petition for rehearing in *Royal II*. The parties were aware that additional beneficiaries would become the responsibility of the 1974 Benefit Plan as a result of *Royal II* and similar decisions. Other companies had indicated an intention to cease employing members of the UMWA and terminate benefits at the expiration of the 1984 Agreement, including Barnes & Tucker and Y & O Coal Company.

(37) The parties discussed the need for additional funding for the 1974 Benefit

Plan. The BCOA initially resisted renewing the guarantee of benefits, but ultimately agreed to do so. The BCOA proposed a contribution of five cents per hour to the 1974 Benefit Plan, and ultimately agreed to eight cents, assuming a zero balance at the end of the contract. The Union negotiators had projected that contributions in the range of 18 to 22 cents per hour would be necessary to provide benefits to the potential beneficiaries and maintain the corpus of the trust at the end of the contract. They expressed skepticism that eight cents would be sufficient to provide benefits to the potential beneficiaries over the term of the agreement. The BCOA responded that, since they were guaranteeing the benefits, the UMWA should not be concerned about the contribution rate, and that additional money would be forthcoming if necessary. The BCOA preferred to maximize cost savings by minimizing the initial contribution rate, and providing additional funding under the guarantee clause if necessary. The UMWA also proposed and the BCOA accepted provisions requiring that employers who ceased to contribute to the 1950 and 1974 Benefit Plans pay withdrawal liability to the plans. A substantial number of non-BCOA companies who had signed "me too" contracts and agreed to be bound by the terms of the 1988 NBCWA became bound by those provisions. Due primarily to the fully funded status of the 1950 Pension Plan, the BCOA and other signatory companies received a reduction in labor costs of approximately $2.86 to $2.88 per hour.

(38) The guarantee of benefits contained in the 1978, 1981, 1984, and 1988 agreements included a provision for the BCOA to increase the contribution rate if necessary to maintain the level of benefits. Such increases are binding upon all signatory employers, not just the members of the BCOA. The mechanism has been employed during the term of the 1988 agreement to increase contributions to the 1950 Benefit Plan.

(39) ERISA does not impose any minimum vesting requirement with respect to employee welfare benefit plans, and there is no evidence in the legislative history that Congress intended that health and life insurance benefits, such as those provided by the National Bituminous Coal Wage Agreements, can be terminated at will if the parties agree otherwise. Whether the pensioners at bar are entitled to health benefits as a vested, lifetime benefit depends upon the intent of the parties to the collective bargaining agreement. *International Union, United Auto Workers v. Yard-Man Inc.,* 716 F.2d 1476 (6th Cir.1983), *cert. denied* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984); *Bower v. Bunker Hill Co.,* 725 F.2d 1221 (9th Cir.1984); *Local Union No. 150A, UFCW v. Dubuque Packing Co.,* 756 F.2d 66 (8th Cir.1985). If benefits are vested, they may not be altered without the consent of the retirees. *UMWA Health and Retirement Funds v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982); *Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971).

(40) The language of the plan benefits contained in the past five collective bargaining agreements between the UMWA and the BCOA, providing that a pensioner "will be entitled to retain a health services card for life," together with the 25-year history of lifetime benefits prior to 1974, and the testimony of the parties of record establish that the parties intended to provide health benefits to the individual plaintiffs for life. We find that the language confers a right to benefits for the lifetime of the pensioner. *See also District 29, UMWA v. Royal Coal Company,* 826 F.2d at 282–283; *Crockett v. Vecellio & Grogan, supra,* slip op. at 4, *Grubbs v. UMWA 1974 Benefit Plan,* 723 F.Supp. 123 (W.D.Ark.1989). Similar language was interpreted to create a vested right to lifetime benefits in *Policy v. Powell Pressed Steel Co.,* 770 F.2d 609 (6th Cir.1985). The argument of the BCOA and the 1974 Benefit Plan that the language is irrelevant is unpersuasive, particularly in view of the fact that it was expressly retained in the 1978 agreement when the BCOA sought its removal.

(41) Although the intent to provide lifetime benefits to retirees is unambiguous, the collective bargaining agreements and the plan documents are ambiguous concerning whether the employer or the 1974 Benefit Plan is obligated to provide such benefits when the employer is no longer a signatory to the collective bargaining agreement.

(42) There is no persuasive evidence that the parties intended to cause the forfeiture of benefits or to create a gap in coverage where an employer is not legally obligated to provide benefits to these pensioners. Instead, the credible evidence supports the position of the pensioners. To alter the nature of a pension-related benefit, which has been a lifetime benefit for more than 25 years, requires more persuasive evidence than exists of record. Nothing in the collective bargaining agreements, the plan documents or the evidence presented by the BCOA or the Trustees preponderates that the parties intended to deprive these pensioners of benefits.

■ (43) The evidence preponderates that the purpose of the 1981 amendment to the "no longer in business language" was to prevent employers from avoiding their obligations to their pensioners during the term of the agreement—not to deprive pensioners of their benefits upon the happening of contingencies entirely beyond their control. No other interpretation is consistent with the credible evidence or the fact that the Union agreed to the change, without dissent. We are persuaded that a change of that magnitude would have evoked a concern on the part of the Union. The Union's position is buttressed by the testimony of Roger Haynes in the *Allied* case where he stated, in response to a question concerning whether there could be a whole group of Allied pensioners who would have no coverage whatsoever: "I would be very shocked and surprised if the union would ever agree to that." It is clear that both parties, in adopting the language, presupposed that the employer was obligated to provide benefits and intended to ensure during the term of the agreement that the employer rather than the 1974 Benefit Plan would pay benefits unless unable to do so. Our conclusion is reinforced by the fact that the "no longer in business" clause refers to *signatory* employers, indicating that the 1974 Benefit Plan must provide benefits to retired miners who

> ... would otherwise cease to receive the health and other non-pension benefits provided herein because the *signatory* employer, including successors and assigns ... is no longer in business.

A signatory employer is obligated to provide benefits for the term of the contract to which it is signatory regardless whether it has any operations covered by the contract, i.e., coal mining operations. The Transport, Inc. case is an example of the intended application of the clause—a signatory employer no longer operating which is financially able to provide benefits, and still under an obligation to do so. There is no support in the record for the contention that the pensioners or the Union purposely agreed to divest vested pension rights in favor of a scheme that would condition receipt of benefits upon the financial condition of an entity that has no obligation to pay benefits.

(44) The evidence preponderates that the parties, in moving from a system where the health benefits were provided solely by the 1974 Benefit Plan to a regime in which individual employers assumed primary liability, intended to change the method of providing health benefits, but we find that they did not intend to create loopholes in the coverage. *District 29, UMWA v. UMWA 1974 Benefit Plan and Trust*, 826 F.2d 280, 283 (4th Cir.1987).

(45) Although the 1978 and 1981 Agreements and their associated plan documents are ambiguous concerning whether the employer or the 1974 Benefit Plan was obligated to provide benefits after the expiration of the contract, the agreements had been construed by a number of courts prior to the 1988 negotiations. Without exception, the authorities interpreted the agreements and plan documents to impose the obligation to provide benefits on the 1974 Benefit Plan, and that the employer was no longer obligated to provide benefits after

the expiration of the agreement. *District 17, UMWA et al v. Allied Corporation,* 735 F.2d 121 (4th Cir.1984), *on reh'g en banc,* 765 F.2d 412 (4th Cir.1985); *District 29, UMWA v. Royal Coal Company,* 768 F.2d 588 (4th Cir.1985), on remand, *aff'd District 29, UMWA et al. v. UMWA 1974 Benefit Plan and Trust,* 826 F.2d 280 (4th Cir.1987), *cert. denied* — U.S. —, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *Schifano v. UMWA 1974 Benefit Plan and Trust,* 655 F.Supp. 200 (N.D.W.Va.1987); *Box v. Coalite,* 643 F.Supp. 709 (N.D.Ala.1986); *Crockett v. Vecellio & Grogan, Inc.,* 88–1448 (S.D.W.Va. Feb. 4, 1987). The Trustees adopted this interpretation with respect to the liability of former employers.

(46) The readoption of the language in the 1988 Agreement confirms that the judicial interpretations correctly represent the intent of the parties.

(47) The appropriate standard of review of the Trustees' decision to deny benefits to these pensioners appears to be *de novo* review. *Firestone Tire and Rubber Co. v. Bruch,* — U.S. —, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Nothing in the collective bargaining agreements or plan documents prescribe a more stringent standard. Since the restructuring of the Funds in 1974, the Trustees are without discretionary authority to establish eligibility standards or to construe the terms of the trust. Moreover, assuming that the appropriate test of trustee discretion is the "arbitrary and capricious" standard, as urged by the Trustees, we find that the decision to deny benefits to these pensioners was arbitrary and capricious.

■ (48) The Trustees interpreted Article IIE.4.b. of the Plan documents and Article XX(c)(3)(ii)(b) of the NBCWA to preserve the corpus of the trust at the expense of the intended beneficiaries. The eight former signatory employers at issue have no legal obligation to pay benefits to plaintiffs, as the Benefit Plan conceeds, and therefore the financial status of these employers is simply irrelevant to a determination of health benefit entitlement. As rehearsed, the 1974 Benefit Plan was established to guarantee the payment of non-pension benefits to pensioners, such as plaintiffs, to prevent the hardships to which plaintiffs are exposed. We hold that the Trustees made an erroneous decision on a question of law. *Schifano v. UMWA 1974 Benefit Plan,* 655 F.Supp. 200, 204 (N.D.W.Va.1987).

(49) The concern of the Trustees for the solvency of the trust is misplaced under the circumstances. Article XX(h) of the NBCWA of 1988 provides that the signatory employers will fully guarantee the solvency of the 1974 Benefit Plan with appropriate contributions and "may increase, not decrease, the rate of contributions to the ... 1974 Benefit Fund ... during the term of this Agreement." 1988 NBCWA at p. 142. In addition, Article XII of the Plan documents requires that any employer who makes contributions to the 1974 Benefit Plan shall make the contributions that are required by the NBCWA. There can be no dispute that the Trustees have the power and duty to enforce these provisions, if necessary. *See* Article VIII(8) and (9) of the 1974 Benefit Plan; Art. XX(vii)(6) and (10) of NBCWA of 1988.

■ (50) The failure of a trustee to administer a pension plan in accordance with the governing documents constitutes a breach of a fiduciary duty. *Delgrosso v. Spang & Co.,* 769 F.2d 928 (3d Cir.1985). Where, as here, the employer and the union agree by contract to provide non-pension benefits to a pensioner for the term of the contract, the failure of the trustees to provide such benefits is arbitrary and contrary to the bargained agreement.

(51) The construction of the contract urged by the Trustees would have the effect of defeating the expressed intention of the parties to provide lifetime benefits to these pensioners, and render the promise of lifetime benefits illusory. The position of the Trustees was held to be arbitrary and capricious by several courts that have addressed the issue. *District 29, UMWA v. Royal Coal Company,* 8 E.B.C. 1556, 1567 (S.D.W.Va.1987); *Schifano v. UMWA 1974 Benefit Plan and Trust,* 655 F.Supp. 200 (N.D.W.Va.1987); *Grubbs v. UMWA 1974*

*Benefit Plan and Trust, supra,* slip op. at 11.

■ (52) As an alternate finding, we hold that the obligation of the Trustees to provide benefits was litigated and decided in *District 29, UMWA v. Royal Coal Company,* 8 E.B.C. 1556 (S.D.W.Va.1987), *aff'd District 29, UMWA v. UMWA 1974 Benefit Plan and Trust,* 826 F.2d 280 (4th Cir. 1987), *cert. denied* — U.S. ——, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *Schifano v. UMWA 1974 Benefit Plan and Trust,* 655 F.Supp. 200 (N.D.W.Va.1987), and *Crockett v. Vecellio & Grogan, Inc.,* No. 85–1448 (S.D.W.Va. Feb. 4, 1987). The argument of the 1974 Benefit Plan that the issue presented in this case is distinct from the issue litigated and decided in *Royal* is without merit. Although the eight employers involved in this litigation present a variety of specific factual situations, most are apparently financially able, either themselves or through solvent parent corporations, to provide benefits to their pensioners, but they are not legally obligated because they are no longer signatories to a collective bargaining agreement which requires them to do so.

(53) The UMWA 1974 Benefit Plan and Trust was a party in *Royal, Schifano,* and *Crockett. Royal* was decided after a trial on the merits; *Schifano* and *Crockett* were decided on cross-motions for summary judgment. The decision of the district court in *Royal* was appealed to the United States Court of Appeals for the Fourth Circuit, which affirmed the decision of the district court on August 13, 1987. The Plan's petition for certiorari was denied by the Supreme Court on March 7, 1988. All three judgments are final.

(54) The UMWA 1974 Benefit Plan and Trust had a full and fair opportunity to litigate the issue in the prior actions. It elected to submit *Schifano* and *Crockett* on motions for summary judgment. In *Royal,* following the remand by the Court of Appeals in *Royal I,* the district court granted a preliminary injunction against the 1974 Benefit Plan on August 13, 1985. The trial on the merits was held on July 9, 1986, eleven months later. The 1974 Bene-fit Plan had a full opportunity to conduct discovery prior to the trial. Following the trial, the district court left the record open for an additional two months to permit the parties to supplement the record with additional evidence. The *Royal* court had the benefit of testimony from a number of witnesses, including William Miller of United States Steel Corporation, a main table negotiator for the BCOA in the 1978, 1981, and 1984 negotiations; Roger Haynes of Consolidation Coal Company, the principal BCOA spokesman on benefits issues in the 1978, 1981, and 1984 negotiations; Sam Church, former UMWA vice-president and president and a principal UMWA negotiator in 1978 and 1981; William Hartman of Peabody Coal Company, a BCOA main table negotiator in 1978, and Michael Buckner, a UMWA staff member who was present at the main table and benefits subcommittee negotiations in 1984. The parties also agreed to include by stipulation much of the record developed in the case of *District 17, UMWA v. Allied Corporation,* including depositions of the three trustees of the UMWA Health and Retirement Funds during the terms of the 1978 and 1981 agreements, among them Harrison Combs, General Counsel of the UMWA and a principal UMWA negotiator in 1978 and 1981, and the depositions of Donald Pierce and Roger Haynes, principal benefits specialists for the UMWA and BCOA, respectively, in the 1978 and 1981 negotiations. The court also considered extensive documentary evidence submitted by the parties. The UMWA 1974 Benefit Plan and Trust never contended on appeal in *Royal* that it was deprived of any procedural opportunity to develop and litigate the case adequately. It is clear that the *Royal* case was regarded by all parties as a test case on this issue, and that the 1974 Benefit Plan and Trust had a substantial incentive to vigorously litigate the issue.

(55) The application of the doctrine of non-mutual issue preclusion is appropriate here. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder–Tongue Laboratories v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788

(1971); *Gregory v. Chehi,* 843 F.2d 111 (3rd Cir.1988). There is no reason to decline to apply the rule. The individual pensioners in this litigation could not have joined as parties in *Royal* because they were still receiving benefits from their employers at the time. Also, there is no reason to deny issue preclusion because there was no difference in the standard of review of the decisions of trustees between the Third and the Fourth Circuits at the time *Royal* was decided. *Richards v. UMWA Health and Retirement Funds,* 851 F.2d 122 (4th Cir. 1988); *LeFebre v. Westinghouse Electric Corporation,* 747 F.2d 197 (4th Cir.1984); *Struble v. New Jersey Brewery Employees Welfare Trust Fund,* 732 F.2d 325 (3d Cir. 1984). The 1974 Benefit Plan has been held to be precluded from relitigating the precise issue presented in this case. *Grubbs v. United Mine Workers of America 1974 Benefit Plan and Trust,* No. 87–2207 (W.D.Ark. Feb. 17, 1989); *In re Chateaugay,* No. 86 B 1120, AP No. 88–5502 (Bankr.S.D.N.Y., bench opinions Aug. 1 & 4, 1988); *In re Kaiser Steel Corporation,* 106 B.R. 669 (Bankr.D. Colo. 1989).

(56) According to plaintiffs, the legal issue presented in this case is "whether the UMWA 1974 Benefit Plan and Trust is obligated to provide health benefits to individual pensioners of the eight employers involved in this matter, where those employers are no longer legally obligated to do so." Proposed Findings of Fact and Conclusions of Law of Defendants at ¶ 40. Plaintiffs argue that the UMWA 1974 Benefit Plan and Trust litigated the same issue in *District 29, United Mine Workers of America v. United Mine Workers of America 1974 Benefit Plan and Trust,* 826 F.2d 280 (4th Cir.1987), *cert. denied* — U.S. ——, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988). Hence, the Plan should be precluded from relitigating the same issue in this case. We agree.

(57) "The present case ... involves use of collateral estoppel—a plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329, 99 S.Ct. 645, 650, 58 L.Ed.2d 552 (1978). As the Supreme Court has stated, we have broad discretion to determine when offensive collateral estoppel or issue preclusion should be applied. *Id.*

(58) Collateral estoppel bars a party from relitigating issues decided in a prior proceeding where (a) the issue decided in the prior litigation is identical to the issue presented in the action in question, (b) the prior litigation resulted in a final judgment on the merits, (c) the party against whom the estoppel is asserted was a party to the prior action, and (d) the party against whom the estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action. *Orchard v. Covelli,* 652 F.Supp. 1173, 1175 (W.D.Pa.) (citing *Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840 (3d Cir.1974)), *aff'd without opinion,* 829 F.2d 32 (3d Cir.1987). Application of collateral estoppel will be declined if (a) the party to be estopped had little incentive to vigorously litigate the first action, (b) the first judgment is inconsistent with other judgments on the issue to be estopped or (c) the second action affords procedural opportunities unavailable in the first action. *Glictronix Corp. v. American Telephone and Telegraph Company,* 603 F.Supp. 552, 565 (D.N.J.1984).

(59) In *Royal Coal II,* the Court of Appeals for the Fourth Circuit addressed the issue "whether the 1974 Benefit Plan must provide health benefits where the successor corporation of the former employer is financially able to provide benefits, but is not legally obligated to do so because it is not a signatory to the wage agreement." 826 F.2d at 282. The court concluded that the 1974 Benefit Plan and Trust must assume the burden of providing lifetime benefits to "orphaned" pensioners because "[t]o construe the contract to create no liability on the part of the 1974 Benefit Plan would have the effect of defeating the expressed intention [of the parties]." *Id.* at 283. To construe the contract to impose

liability on the 1974 Benefit Plan and Trust, according to the court, "can only further the purposes for which the trust fund was created." *Id.*

(60) The 1974 Benefit Plan and Trust argues that the issue presented in the case at bar is different from the issue litigated in *Royal Coal.* We disagree. As defendants note, although the employers involved in this litigation present a variety of factual situations, the employers are "apparently financially able, either themselves or through solvent parent corporations, to provide benefits to their pensioners." Proposed Findings of Fact and Conclusions of Law of Defendants at ¶ 40. However, as in *Royal Coal,* the employers are not legally obligated to provide benefits. Thus, we hold that the issue raised in the instant case is identical to the issue raised in *Royal Coal.*

◼ (61) The 1974 Benefit Plan and Trust does not dispute that a final judgment was rendered in *Royal Coal.* However, the Plan asserts that collateral estoppel should not be applied because "the Union could have easily joined in the *Royal ... litigation.*" Proposed Conclusions of Law Submitted by the 1974 Benefit Plan and Trust at ¶ 12. The Plan cites the general rule set forth in *Parklane Hosiery* that "in cases where a plaintiff could easily have joined in the earlier action ... the use of offensive collateral estoppel should not be allowed." *Parklane Hosiery,* 439 U.S. at 331, 99 S.Ct. at 651.

(62) We hold that the Union was in privity with the plaintiff in *Royal Coal,* and thus, the issue whether the Union could have joined in the action is not dispositive. The interests of the Union and the plaintiffs in *Royal Coal* were substantially similar, if not identical—that is, to protect the health benefits of "orphaned" retirees. Further, as the Plan concedes, the Union provided the plaintiffs in *Royal Coal* with an attorney who contributed to the litigation strategy of the case, entered an appearance and participated in the proceedings. Proposed Conclusions of Law Submitted by the 1974 Benefit Plan and Trust at ¶ 12. The Plan also observes that the Union bore the costs of the litigation. *Id.* Finally, we note that with respect to the individual pensioners, they could not have joined as parties in *Royal Coal* because they were still receiving benefits from their employers at that time.

(63) We hold that the 1974 Benefit Plan and Trust had a full and fair opportunity to litigate the issue presented in this case during the *Royal Coal* litigation. Following a remand by the Court of Appeals, the district court granted a preliminary injunction against the Plan on August 13, 1985. The trial on the merits was held on July 9, 1986, eleven months later. Following the trial, the court left the record open for two months for the parties to submit additional evidence. The matter was again appealed, and the decision of the district court with respect to the issue of the Plan's liability was affirmed.

(64) The evidence preponderates that the 1974 Benefit Plan and Trust was given a full and fair opportunity—procedurally, substantively, and evidentially—to defend its position in *Royal Coal* and that the Plan vigorously presented such a defense. *See Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 845 (3d Cir.1974). We note that the Plan does not contend that it was afforded procedural opportunities which were unavailable in the first action or that the controlling circumstances have changed so that application of collateral estoppel would be inappropriate.

(65) The 1974 Benefit Trust and Plan argues that the judgment in *Royal Coal* is inconsistent with the judgment in *Scarbo v. Slab Fork Coal Company,* No. 5:83–5309 (S.D.W.Va. June 10, 1987), and thus application of issue preclusion is unfair. In our judgment, the decisions are not inconsistent. In *Scarbo,* the employer was a signatory to the wage agreement. The company was forced into bankruptcy but continued to operate its carbon black plant, which employed nine persons covered under the wage agreement. The court concluded

that by continuing to employ classified workers at its plant, the employer failed to meet the second element of the "no longer in business" test; hence, the employer was still in business under the agreement. Slip op. at 3. Although the courts in *Royal Coal* and *Scarbo* were required to interpret the "no longer in business" clause in the agreements, the similarity between the cases ends there. One of the most significant distinguishing facts in the cases is that in *Royal Coal,* the successor corporations were not signatories under the agreement. Further, the district court in *Scarbo* was required to examine only the language of the agreement; the court in *Royal Coal* was required to examine the intent of the parties.

(66) Finally, the 1974 Benefit Plan and Trust argues that collateral estoppel is inappropriate in this case in light of the early stage of development of employee benefits law and the important issues involved. We recognize that significant issues and interests are at stake. However, with respect to the Plan's claim concerning the development of employee benefits law, we note that the decision of the Court of Appeals in *Royal Coal* rested on the interpretation of the wage agreements, not on the construction and application of employee benefits law.

(67) In sum, we hold that all of the elements have been satisfied to invoke offensive collateral estoppel against the 1974 Benefit Plan and Trust and that the Plan is, therefore, bound by the decision in *Royal Coal.*

(68) With respect to the BCOA, we hold that the BCOA is not bound by the decision in *Royal II.* The parties do not dispute that the BCOA was not a party in the *Royal* litigation. However, the Union argues that the BCOA had the opportunity and motivation to intervene and participate in the *Royal* litigation and, as a result, the BCOA should be bound by the decision.

(69) The Supreme Court recently rejected a similar argument in *Martin v. Wilks,* — U.S. —, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). In *Martin,* the Court addressed the issue whether a non-party that was aware of an earlier action, but failed to intervene, should be precluded from litigating the issue in a subsequent action. The Court stated in pertinent part:

> Joinder as a party, rather than knowledge of a lawsuit and an opportunity to intervene, is the method by which potential parties are subjected to the jurisdiction of the court and bound by a judgment or decree. The parties to a lawsuit presumably know better than anyone else the nature and scope of relief sought in the action, and at whose expense such relief might be granted. It makes sense, therefore, to place on them a burden of bringing in additional parties where such a step is indicated, rather than placing on potential additional parties a duty to intervene when they acquire knowledge of the lawsuit. The linchpin of the 'impermissible collateral attack' doctrine—the attribution of preclusive effect to a failure to intervene—is therefore quite inconsistent with Rule 19 and Rule 24.

*Id.* at —, 109 S.Ct. at 2183–84.

(70) The Union argues that the decision in *Martin* is inapplicable to the instant case because the BCOA's claims are not independent from those asserted by the 1974 Benefit Plan. In other words, according to the Union, the BCOA is seeking to litigate the obligations of the Plan as a surrogate. Whether the claims are independent is not dispositive. The BCOA was not a party in the *Royal* litigation, and in light of the decision in *Martin,* the BCOA cannot be bound by the judgment in *Royal II.*

(71) We find that the Union and the individual plaintiffs have established by a preponderance of the evidence success on the merits in their claims against the BCOA and the 1974 Benefit Plan. We also find that plaintiffs have sustained their burden of proving irreparable harm, that defendants will not suffer substantial harm from the grant of an injunction, and that the public interest favors injunctive relief.

(72) The record is replete with evidence concerning the hardship that the individual plaintiffs are experiencing absent the health care and other benefits to which they are entitled under the Plan documents. Medical treatment has been postponed, hospitalizations delayed and life insurance avoided. Many of the pensioners have attempted to purchase alternate coverage with limited success due to sparse resources and advanced age.

(73) The BCOA and the 1974 Benefit Plan will not suffer substantial harm from the grant of an injunction. The signatory employers to the 1988 NBCWA agreed to increase contributions, if necessary, to insure the solvency of the Benefit Plan and, as rehearsed, the Trustees are empowered to enforce the guarantee clause of Article XX(h).

(74) The public interest also favors the grant of an injunction. Pensioners to whom non-pension benefits are payable are entitled to payment forthwith, without attempting to purchase additional insurance coverage or paying medical bills with limited resources, and then suing the Plan for reimbursement. In short, the public policy requires that the retirees should receive the bargained for non-pension benefits for the remainder of the contract and without further delay.

(75) The court will certify a class pursuant to Fed.R.Civ.P. 23(b)(2). The class consists of in excess of 2100 pensioners, retired or disabled miners under the UMWA 1974 Pension Plan who were employed by former employers signatory to the National Bituminous Coal Wage Agreements of 1978, 1981, 1984 and 1988. Also included in the class are the spouses and dependents of such pensioners. However, those pensioners whose last signatory employers' operations are or were located within the jurisdiction of UMWA Districts 17, 28, 29 or 31 are excluded from the class because those districts are within the jurisdiction of the United States Court of Appeals for the Fourth Circuit. We find that the requirements of numerosity, commonality, typicali-ty and adequacy of representation have been met.

(76) Federal Rule 23(b)(2) provides that an action may be maintained as a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." The 1974 Benefit Plan and the BCOA assert that Rule 23(b)(2) is satisfied in its argument for certifying a defendant class of pensioners. We need not resolve the issue whether a defendant class may be maintained pursuant to Rule 23(b)(2) because the arguments made by the Plan and the BCOA for a defendant class apply to plaintiffs' class of pensioners. The only objection that the UMWA and pensioners expressed in their papers in opposition to maintenance of a class action is that Rule 23(b)(2) does not contemplate the certification of a defendant class. The Union expressed no position with respect to a plaintiffs' class, although Civil Action 88–546 abounds with class overtones. We hold that Rule 23(b)(2) of the Federal Rules of Civil Procedure has been satisfied and that a class of plaintiffs will be certified.

(77) We also find that the interests of judicial economy mandate that this action should be maintained as a class action under Fed.R.Civ.P. 23(b)(3). In Civil Action 88–0545, the Trustees of the 1974 Benefit Plan and the BCOA seek to certify a defendant class of UMWA pensioners. In Civil Action Nos. 86–2638, 88–0546 and 88–1842, the UMWA pensioners are plaintiffs and the United Mine Workers of America 1974 Benefit Plan and Trust is the defendant. The court finds there are questions of law and fact common to the parties and these questions control any questions involving individual claimants. This class, with the exception of Districts 17, 28, 19 and 31 of the UMWA, meets the four prong test of Rule 23(b)(3).

(78) The class of plaintiffs is defined as pensioners, their spouses and dependents under the UMWA 1974 Pension Plan (a)

who are or were eligible for health benefits under employee welfare plans maintained by employers signatory to the 1978, 1981 and 1984 NBCWA; (b) whose last signatory employer ceased providing health benefits to pensioners who last worked for the employer or will cease providing health benefits to such pensioners before a final judgment is entered in this action; (c) whose last signatory employer satisfies the definition of "no longer in business" set forth in the 1988 NBCWA and the Plan document effective June 7, 1981 and as subsequently amended effective October 1, 1984 and February 1, 1988; and (d) whose last signatory employer did not or does not operate principally within the jurisdiction of UMWA Districts 17, 28, 29 or 31, or the United States Court of Appeals for the Fourth Circuit, or any pensioner who was last employed by LTV Steel Corporation, its subsidiaries or affiliates. Nothing herein shall be construed to include pensioners of companies that are signatory to agreements with the UMWA, but that (pursuant to those agreements) do not provide health benefits to certain pensioners, as for example, the agreement negotiated by the UMWA with A.T. Massey Co.

(79) Counsel for the United Mine Workers of America International Union, Districts 2, 4, 5 and 6, and the individual plaintiffs, shall submit appropriate orders to the court, within 10 days, including an order defining the class, an injunctive decree with security as required by Rule 65(c), and an order for the entry of judgment in accordance with Rule 52(b).