**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 18 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JAKE AGUILAR; CHARLES J.
AVILA; FRANK R. BARRON;
ALFONSO CASAREZ; FRANK
CORDOVA; EUGENE G. DURAN;
RICHARD DURAN; ALEX GARCIA;
EDDIE W. GOMEZ; JOE L. GOMEZ;
ELOY GUTIERREZ; THOMAS A.
HAY; MIGUEL L. HERRERA;
HARRY S. MESTAS; JOSEPH G.
MONDRAGON; GEORGE
MONTOYA; LEE MONTOYA; SAM
MONTOYA; REUBEN J. NUNEZ;
PHIL G. PADILLA; MARTIN
QUINTERO; FILBERT J. ROYBAL,
JR.; SALVADOR SANCHEZ;
ARTHUR L. SANDOVAL; EDWARD
SHANNON; LARRY D. SHAW;
JACK SCHUSTER; STEPHEN R.
SMITH; JOHN A. TOKAR; JOE N.
TRUJILLO, JR.; PETE J. VALDEZ;
PHILADELPHIO S. VELARDE;
ERNEST E. VENSOR; JOE L. VIGIL;
LEROY G. VIGIL; ROBERT F.
WHITE; INTERNATIONAL UNION
UNITED MINE WORKERS OF
AMERICA; JOSEPH L. DURAN;
MAX CASIAS; JAMES SUAZO;
HENRY J. CHAVEZ; ROBERT
DOMINGUEZ,

           Plaintiffs - Appellees,

      v.

BASIN RESOURCES, INC.,

           Defendant - Appellant.

No. 01-1418
(D.C. No. 98-N-885)
(D. Colorado)

## ORDER AND JUDGMENT [*]

Before **LUCERO** , **HOLLOWAY** , and **MURPHY** , Circuit Judges.

## I. INTRODUCTION

Appellees are the International Union, United Mine Workers of America ("the Union") and a group of retired miners.  They brought an action against appellant Basin Resources, Inc. ("Basin" or "BRI"), the retirees' former employer, to compel Basin to pay the retirees' health benefits for the length of their lives.  The district court granted summary judgment to the Union and the retirees.  We have jurisdiction under 28 U.S.C. § 1291 and **reverse and remand** .

## II. FACTS

Basin bought a coal mine in Las Animas County, Colorado in 1991.  At that time the miners' wages and benefits were controlled by the 1988 National Bituminous Coal Wage Agreement ("NBCWA").  The 1988 NBCWA was the latest in a series of national collective bargaining agreements between the Union and the Bituminous Coal Operators' Association, a national association of coal mine operators.  The 1988 NBCWA expired in February 1993, and the Union

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

began negotiating the 1993 NBCWA with the Operators' Association. Basin, however, informed the Union that it wished to negotiate a collective bargaining agreement entirely separate from the 1993 NBCWA to cover only its operations in Las Animas County. It is undisputed that the 1993 wage agreement ("the agreement" or "the 1993 agreement") emerging from these negotiations borrowed much of its language from both the 1988 and 1993 NBCWAs. In addition, the parties agree that they used the 1988 NBCWA as a starting point in drafting the 1993 agreement between Basin and the Union.

The agreement was finalized in July 1993. Article XVIII establishes miners' and retirees' rights to pension and health benefits in general terms.[1] Appendix C to the agreement, finished in January 1995, provides more details about the benefits.[2]

---

[1] Article XVIII provides: "BRI agrees to provide the level of health insurance benefits set forth in the Employer Benefit Plan provided in the 1988 NBCWA for the duration of this Agreement, both for its active employees and retirees . . . . The health and dental provisions are set forth in Appendix C to this Agreement."

[2] Appendix C states that the "general purpose of the [benefit] plans referred to in this Appendix shall be to provide health care for working and retired miners . . . and their dependents; . . . and financial support for surviving spouses and surviving dependents."
Section (b)(3)(i) of Appendix C provides:

BRI shall establish and maintain an Employee benefit plan, . . . to provide health . . . for its Employees covered by the Wage Agreement as well as pensioners . . . . The benefits provided by BRI to its

(continued...)

Basin closed the mine in December 1995. In December 1997, the 1993 agreement expired. At that time, Basin terminated the health benefits of retirees who were not covered by the Coal Industry Retiree Health Benefits Act of 1992, 26 U.S.C. §§ 9701-9722 [hereinafter the Coal Act], including those of the individual appellees. [3]

Appellees filed suit in federal district court in Colorado, asserting that Basin breached the 1993 collective bargaining agreement when it terminated retiree health benefits. They contended that Basin promised in the 1993

---

[2](...continued)
eligible Participants pursuant to such plans shall be guaranteed during the term of the Wage Agreement by BRI at levels set forth in such plans.

Section (g) provides that "[Basin] hereby agrees to fully guarantee the health benefits provided under its own Employer Plan . . . during the term of 'this' Wage Agreement."

Appendix C also contains a "GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS." The general description provides, in part, "[t]he benefits and benefit levels provided by [Basin] under its Benefit Plan are established for the term of 'this' Wage Agreement only, and may be jointly amended or modified in any manner at any time after the expiration or termination of the Wage Agreement."

The general description also provides that pensioners "will be entitled to retain a Health Services card for *life*. Upon his death, his widow will retain a Health Services card until her death or remarriage." (emphasis added).

[3] The Coal Act provides that signatories to an NBCWA and their successors, whether or not in the coal business, are responsible for paying the lifetime health benefits of their own employees eligible for retirement benefits as of February 1, 1993 and who actually retired on or before September 30, 1994. *See* 26 U.S.C. § 9711. All of the individual appellees in this case retired after September 30, 1994 and therefore are not covered by the Coal Act.

agreement to provide lifetime health care benefits to its retirees. They sought an injunction requiring Basin to provide health benefits and damages for health care costs incurred since termination of the miners' benefits. In a thorough opinion, the district court granted summary judgment to the plaintiffs-appellees. It reasoned that the agreement was ambiguous, noting that in some parts the agreement provided that retirees would receive benefits only during the term of the agreement, while in others it provided that retirees would receive benefits for life. The district court then looked to extrinsic evidence to determine the parties' intent. It considered the often-interpreted 1988 and 1993 NBCWAs and concluded that under those agreements, retirees were promised health benefits for life. The court concluded that because the 1993 agreement borrowed much of its language from those agreements, the parties intended to retain the promise of lifetime benefits. Rejecting Basin's argument that differences in language between the agreement and the 1988 and 1993 NBCWAs revealed the parties' intent to discontinue lifetime benefits, the district court entered judgment for appellees.

## III. DISCUSSION

## A. Standard of Review

We review a grant of summary judgment *de novo*, employing the same standard used by the district court. *See Bullington v. United Air Lines, Inc.*, 186

F.3d 1301, 1313 (10th Cir. 1999). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To determine whether an issue is genuine, this court employs a standard that mirrors the standard governing motions for judgment as a matter of law under Federal Rule of Civil Procedure 50. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986). An issue is genuine, and summary judgment should be denied, if the evidence is such that a reasonable jury could find in favor of the nonmovant. *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). More than a scintilla of evidence is required to defeat a motion for summary judgment. *See Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997). The nonmovant must present evidence sufficient to sustain a jury verdict in its favor, *i.e.*, enough evidence that "reasonable minds could differ as to [its] import." *Liberty Lobby*, 477 U.S. at 250-51. "[W]e view the factual record and inferences therefrom in the light most favorable to the nonmoving party." *Bullington*, 186 F.3d at 1313.

## B. The Parties' Intent

We agree with the district court that the 1993 collective bargaining agreement is ambiguous on its face. While numerous references are made to

-6-

health benefits "for life" or "until death," the agreement also provides that Basin will guarantee health benefits "during the term of 'this' Wage Agreement" and that "the benefits and benefit levels provided by [Basin] . . . are established for the term of 'this' Wage Agreement only." [4] It was thus proper to consult extrinsic evidence to discern the parties' intent. *Cf. Volkman v. United Transp. Union*, 73 F.3d 1047, 1050 (10th Cir. 1996). Basin argues that the extrinsic evidence submitted to the district court demonstrates that a genuine issue of fact exists regarding whether the parties intended to obligate Basin to pay retirees' health benefits for life. We agree.

---

[4] The germ of this ambiguity is the parties' use of the 1988 NBCWA as a starting point for drafting of the 1993 collective bargaining agreement. The NBCWAs have often been interpreted to absolve individual employers of the obligation to provide lifetime benefits. *See, e.g., Dist. 29, United Mine Workers v. Royal Coal Co.*, 768 F.2d 588, 592 (4th Cir. 1985) [hereinafter *Royal I*]; *United Mine Workers Int'l Union v. Nobel*, 720 F. Supp. 1169, 1179-80 (W.D. Pa. 1989), *aff'd sub nom. Bd. of Trs. of United Mine Workers 1974 Benefit Plan & Trust v. Int'l Union, United Mine Workers*, 902 F.2d 1558 (3d Cir. 1990) (unpublished table decision). At the same time, the agreements have been interpreted to guarantee lifetime health benefits to retired miners. *See Dist. 29, United Mine Workers of Am. v. United Mine Workers 1974 Benefit Plan & Trust*, 826 F.2d 280, 282-83 (4th Cir. 1987) [hereinafter *Royal II*]; *Nobel*, 720 F. Supp. at 1178-79. The federal courts have resolved this ambiguity by concluding that the responsibility for paying lifetime benefits devolved to the 1974 Benefit Plan, a fund created by the 1974 NBCWA and contributed to by all members of the Bituminous Coal Operators' Association. *See Royal II*, 826 F.2d at 281, 283; *Nobel*, 720 F. Supp. at 1179-80; *see generally E. Enters. v. Apfel*, 524 U.S. 498, 509-10 (1998) (plurality opinion) (describing creation of 1974 Benefit Plan).

Among the types of extrinsic evidence a district court may consult in determining the meaning of an ambiguous collective bargaining agreement are the structure of the agreement, the past practices of the parties, the "common law of the shop," [5] the history of negotiations between the parties, and the parties' conduct reflecting their understanding of the agreement. *See Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1243 (10th Cir. 1998); *Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993). As the parties knew, the coal industry has long recognized the right of retired miners to lifetime health benefits. *See generally United Mine Workers Int'l Union v. Nobel*, 720 F. Supp. 1169, 1173-75 (W.D. Pa. 1989), *aff'd sub nom. Bd. of Trs. of United Mine Workers 1974 Benefit Plan & Trust v. Int'l Union, United Mine Workers*, 902 F.2d 1558 (3d Cir. 1990) (unpublished table decision); *United Mine Workers Int'l Union v. Bethenergy Mines, Inc.*, No. Civ. A. 2:99-0738, 2001 WL 737558, at *3 (S.D.W. Va. Mar. 19, 2001). On the basis of the promises in the NBCWAs to provide retirees and their spouses with health services cards "for life" and "until death," the NBCWAs uniformly have been interpreted to provide retired miners with lifetime health benefits. *See Unity Real*

---

[5] "The 'common law of the shop' is peculiar to labor-management agreements, but it functions as a source of meaning for the parties in a manner similar to that of 'trade custom and usage' in the commercial contract context." *NCR Corp., E & M – Wichita v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge No. 70*, 906 F.2d 1499, 1501 n.3 (10th Cir. 1990).

*Estate Co. v. Hudson*, 178 F.3d 649, 665-67 (3d Cir. 1999); *Royal II*, 826 F.2d at 282-83; *Nobel*, 720 F.Supp. at 1178. That the 1993 agreement explicitly "retains" [6] the references to "for life" and "until death" from the NBCWAs is strong evidence that the parties intended a similar meaning. *See Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 222 (1979) (observing failure to change contract language previously interpreted by courts "strongly suggests the parties incorporated the courts' interpretation" of the language). As the district court stated: "If Basin wanted to avoid an obligation to pay its retirees health benefits for their lives, then negotiating the inclusion [of] language which explicitly carries forward earlier promises of lifetime benefits was not the way to do it." Dist. Ct. Op. at 21-22.

There is conflicting evidence, however. First, the parties also retained language from the 1988 NBCWA that has been interpreted to absolve individual employers of the responsibility of paying lifetime benefits. In particular, the language in section (b)(3)(i) of Appendix C provides "[t]he benefits provided by [Basin] to [retirees] *shall be guaranteed during the term of the Wage Agreement* by [Basin] at levels set forth in [the Employee Benefit Plan]." (emphasis added).

---

[6] The General Description of the Health and Retirement Benefits contained in Appendix C to the 1993 agreement provides that "[t]he parties expressly agree that the language references to 'for life' and 'until death' *that are retained* in this General Description are intended to mean that [Basin] will provide only the benefits of its own eligible retirees." (emphasis added).

This language is identical in all relevant respects to article XX, section (c)(3)(i) of the 1978, 1981, 1984, and 1988 NBCWAs. Interpreting section (c)(3)(i), numerous courts have concluded that individual employers had no responsibility to pay retiree health benefits beyond the term of a wage agreement. *See Royal I*, 768 F.2d at 592; *see generally Nobel*, 720 F. Supp. at 1179-80. Again, that the parties retained previously interpreted language is evidence they intended to incorporate such interpretations. *See Carbon Fuel*, 444 U.S. at 222. [7]

---

[7] The district court noted that the agreement also adopted language from the 1993 NBCWA which made clear that employers must shoulder the burden of paying for retiree lifetime health benefits, thereby eviscerating the reasoning in cases such as *Royal I* and *Nobel*. Until passage of the Coal Act in 1992, the 1974 Benefit Plan was responsible for paying lifetime benefits to retired miners. By closing the 1974 Benefit Plan to new enrollees, the Coal Act created a situation in which it was unclear who would pay the lifetime benefits of new retirees. *See* 26 U.S.C. §§ 9702(a)(2), 9703(f) (merging 1974 Benefit Plan into United Mine Workers of America Combined Benefit Fund and limiting participation in Combined Benefit Fund to those retirees eligible to receive benefits from the 1974 Benefit Plan as of July 20, 1992). The 1993 NBCWA was drafted to make clear that, notwithstanding article XX, section (c)(3)(i) of the NBCWAs, the provision upon which *Royal I* and *Nobel* relied, individual employers bore the burden of paying lifetime benefits to miners. In the 1993 NBCWA, the general description provides, in part, "The parties expressly agree that the language references to 'for life' and 'until death' that are retained in this General Description are intended to mean that each Employer will provide, *for life*, only the benefits of its own eligible retirees . . . ." (emphasis added).

The 1993 agreement between Basin and the Union is very different, however. It tracks the quoted language but omits the words "for life." The district court concluded that the omission was insignificant. It reasoned that the purpose of the language quoted from the 1993 NBCWA was to make clear that employers only paid the benefits of its own retiring employees. According to the district court, the language adopted in the 1993 Basin-Union agreement serves the

(continued...)

Second, the bargaining history indicates that the parties may have agreed to discontinue lifetime benefits. As an initial step in negotiations, Basin submitted a proposal to the Union on April 27, 1993. Not only did Basin propose that miners who retired during the term of the collective bargaining agreement not receive lifetime health benefits, it proposed that retirees receive no health benefits. The Union responded on June 30, 1993. It rejected Basin's proposal and countered by proposing continuation of lifetime medical coverage for retiring employees. Thus, prior to face-to-face negotiations, the parties had demonstrated a strong disagreement about the continuation of lifetime health benefits for retirees, and Basin had made it clear that it wished to change many of the benefits contained in the 1988 NBCWA.

---

[7](...continued)
same function, even with the omission of "for life." We disagree with the district court's premise. The purpose of the quoted language is not merely to specify that employers would pay the benefits of their retirees. Rather, the language obligates employers to pay the *lifetime* benefits of their retirees. The "for life" language omitted from the Union-Basin agreement is the only language in the 1993 NBCWA that explicitly states as much. Without "for life," the borrowed language cannot be read to supplant the specific language of section (b)(3)(i) of Appendix C that courts have interpreted as relieving employers of the responsibility of paying lifetime health benefits.

The Union provided evidence that the omission does not reflect the parties' mutual intent in adopting the agreement, but rather was made by Basin without the Union's knowledge. Determining the veracity of such a contention and the parties' intent in omitting language is a fact-driven inquiry. As such, it cannot be conducted at the summary judgment stage but must await trial.

The parties met in Denver on July 6 and 7, 1993 for negotiations. The salient events took place on July 7. Around 2:30 p.m., the Union made a presentation summarizing its proposal. The notes of the Union negotiator, Deeds, show that the Union again proposed lifetime medical coverage for retirees. [8] The notes of a company negotiator, Deeny, also reflect that the Union proposed lifetime medical coverage for retirees.

Following the Union's proposal, the negotiators took a break until 7:20 p.m. Basin then responded to the Union's proposal. The notes of Union negotiator Deeds reflect that Basin "agree[d]" to the Union's "medical" proposal. He stated in his notes that Basin acknowledged "Retired medical – life time benefits for people who retired while employed [/] operated by [Basin]." The company negotiators, however, did not expressly note such an agreement. After the counterproposal and another break, Basin negotiator Deeny wanted "clarification" on lifetime medical coverage. Speaking to Union negotiator Rosenblatt, Deeny said he "need[ed] clarification [on] 'lifetime' retirees/agreement." Deeds, the Union negotiator, relates the ensuing conversation as follows:

Deeny:     "Retiree health care – only for life of agreement . . . ."

---

[8] Neither party has objected to the use or admissibility of the bargaining notes. We thus assume their admissibility for purposes of summary judgment, but offer no opinion on their admissibility at trial.

-12-

Rosenblatt:  "Not mandatory subject [for negotiation] next contract.  If we go to next negotiations is it mandatory subject?"

Deeny:  "Yes, it will continue to be mandatory subject."

Deeny's notes surrounding the conversation are:

Deeny:  "Need clarification 'Lifetime' Retirees / Agreement."

Rosenblatt:  "Want it, but permissive.  Would like lifetime commitment."

. . . .

Deeny:  "No lifetime health insurance to retirees, but agree next time to make it mandatory [subject of bargaining]."

Rosenblatt:  "Not sure it's legal –"

Deeny:  "We understand  – agree to negotiate it as mandatory b/c we have [before] now not mandatory, some [unreadable]"

The notes of the other company negotiator, Harriss, are substantially similar to

Deeny's:

Deeny:  "my mistake on Health – for retirees, it[']s life of agreement"

Rosenblatt:  "it isn't on the table – mandatory of future retirees[]; contribution to future retirees[;] it becomes permissible only when they retire[;] on retirees maybe it is"

Rosenblatt:  (continued) "if it isn't do we have an agreement that next time it's on[?]"

Deeny:  "people who retire during this agreement – their coverage is a mandatory subject of bargaining"

Rosenblatt's notes similarly indicate that the company's negotiators stated "retiree

covered during term of agreement . . . continued coverage after term is mandatory

-13-

subject of [bargaining]."    An affidavit from Basin negotiator Harriss supports this interpretation.  Harriss declared that

> During [the] negotiations, Basin Resources, Inc. took the position that health care benefits would be provided for its employees and retirees only during the term of the Collective Bargaining Agreement and anything beyond the termination of the Collective Bargaining Agreement was to be subject to negotiation.
> . . . .
> At no time during the 1993 contract negotiations did Basin Resources, Inc. agree to extend health benefits beyond the term of the 1993 Collective Bargaining Agreement.  The only concession by the Company was to agree that the topic of providing health benefits beyond the term of the Agreement would be subject to mandatory bargaining should there be further negotiations after the expiration of the 1993 agreement.

Viewing the bargaining notes and Harriss' affidavit in the light most favorable to Basin, as we must, we conclude they could be interpreted as evidencing the parties' intent to provide retirees with health benefits only during the term of the agreement and to take up the subject of continuation of benefits during subsequent negotiations.  Such an agreement, while seemingly at odds with the "for life" and "until death" language of certain portions of Appendix C, is entirely consistent with section (b)(3)(i) of the Appendix and the portion of the general description that provides "[t]he benefits and benefit levels provided by [Basin] under its Benefit Plan are established for the term of 'this' Wage Agreement only, and may be jointly amended or modified in any manner at any time after the expiration or termination of the Wage Agreement."

-14-

Other interpretations of the bargaining notes are, of course, possible. The Union Negotiator, Deeds, posited that the parties were in fact discussing the level of lifetime benefits, not the existence. According to his interpretation, the parties agreed to lifetime benefits and merely agreed to make the level of benefits subject to mandatory bargaining. This is a reasonable interpretation. It is not the only one, however, and we must draw all reasonable inferences from the evidence in favor of the party against whom the district court granted summary judgment, Basin. *See Bullington*, 186 F.3d at 1313.

In summary, while there is evidence suggesting the parties intended to provide lifetime health benefits to retiring miners, there is conflicting evidence in the form of bargaining notes, Harriss' affidavit, and the retention of language from the NBCWAs which obligated employers to pay retiree health benefits only during the term of the agreements. A reasonable jury could conclude that, based on this evidence, the parties intended to discontinue lifetime health benefits. Summary judgment was therefore improper.

## IV. CONCLUSION

The judgment of the district court is hereby **REVERSED** and the case is

**REMANDED** for further proceedings consistent with this opinion.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge

No. 01-1418, Aguilar v. Basin Resources, Inc.

**LUCERO,** Circuit Judge, dissenting.

Because I agree with the district court that the 1993 Agreement negotiated between Basin and the Union grants the plaintiffs lifetime health benefits, I respectfully dissent from the majority Order and Judgment. Whether a collective bargaining agreement provides vested health benefits—benefits that survive the expiration of the agreement—is a matter of contract interpretation. Chiles v. Ceridian Corp. , 95 F.3d 1505, 1515 (10th Cir. 1996). "[W]here interpretation of a contract requires examination of extrinsic evidence to determine intent, and where more than one inference may be drawn therefrom, a question of fact is presented." United States v. Hess , 194 F.3d 1164, 1174 (10th Cir. 1999). It follows that when a court can glean only one inference from the contract when viewed in conjunction with extrinsic evidence, there are no questions of material fact left for the trier and summary judgment is appropriate. I conclude that only one inference can be drawn from looking at the face of the 1993 Agreement in the context highlighted by the district court: [1] Basin and the Union intended lifetime

---

[1] The district court looked at the following extrinsic evidence in reaching its conclusion: (1) the fifty-year history of retiree health benefits in the coal industry, (2) the historical background leading to enactment of the Coal Act, (3) industry practice regarding retiree health benefits, and (4) judicial interpretations of previous NBCWAs.

health benefits for those mine workers who retired during the term of the 1993 Agreement.

The majority correctly points out that promises found in previous NBCWAs to provide retirees and their spouses with health services cards "for life" and "until death" have consistently been interpreted to guarantee retirees' lifetime benefits. See Unity Real Estate Co. v. Hudson, 178 F.3d 649, 665–67 (3d Cir. 1999); Dist. 29, United Mine Workers v. United Mine Workers 1974 Benefit Plan & Trust, 826 F.2d 280, 282–83 (4th Cir. 1987); United Mine Workers Int'l Union v. Nobel, 720 F. Supp. 1169, 1179–80 (W.D. Pa. 1989). In the present case, the parties used the 1988 NBCWA as the starting point for their negotiations, and retained the "for life" and "until death" language from the 1988 NBCWA. Retaining these lifetime references strongly evidences the parties' intent to provide lifetime benefits. See Carbon Fuel Co. v. United Mine Workers, 444 U.S. 212, 222 (1979) (explaining that the retention of contract language already interpreted by courts "strongly suggests the parties incorporated the courts' interpretation" of the language). Further support for the conclusion that the parties intended the provision of lifetime benefits for retirees is the fact that the "for life" and "until death" language is found in a section in Appendix C specifically describing retiree benefits. (See 2 Appellant's App. at 499 ("[A] pensioner will be entitled to retain a Health Services Card for life . . . . Upon his

-2-

death, his widow will retain a Health Services Card until her death or remarriage.").)

Concluding that there is also evidence—found in the language of the agreement and in the parties' bargaining notes—that the parties intended to limit health benefits to the term of the 1993 Agreement, the majority reverses the district court's grant of summary judgment to the Union. The majority suggests three reasons why the 1993 Agreement can be interpreted as providing retiree health benefits only for the duration of the Agreement: (1) the "during the term of the Wage Agreement" language in Appendix C indicates such intent; (2) language in Appendix C retained from previous NBCWAs has been construed by courts to relieve an employer of the obligation to pay lifetime retiree benefits; and (3) Basin's bargaining notes reflect an intent to provide retirees with benefits only during the term of the agreement and to make lifetime benefits the subject of mandatory negotiation upon the termination of the agreement. I disagree.

First, section (b)(3)(i) of Appendix C of the 1993 Agreement includes a so-called "guarantee clause" which states that "the benefits provided by [Basin] to [retirees] shall be guaranteed during the term of the Wage Agreement by [Basin] at levels set forth in [the Employee Benefit Plan]." ( 2     id. at 495 (emphasis added).) I disagree with the proposition that this language is inconsistent with an interpretation of the 1993 Agreement as providing lifetime benefits. Language

-3-

cited above limiting benefits to the term of the agreement relates to the __level__ of benefits provided in the agreement and makes the __level__ of benefits subject to future modification by the parties. Appendix C explicitly states that benefits can be "jointly amended or modified in any manner at any time after the expiration or termination of the Wage Agreement." (2 __id.__ at 499 ("General Description of the Health and Retirement Benefits").) This modification provision would be superfluous if there were no benefits that survived the agreement in the first place. Therefore, the only reasonable interpretation of the contract is that it provides for lifetime benefits for retirees with benefit __levels__ subject to future modification by the parties.

This conclusion is buttressed by the fact that NBCWAs from 1978 to 1993 provided lifetime benefits for eligible retirees and also contained substantially identical "for the term of this agreement" language in their respective "guarantee clauses." History explains that previous NBCWAs included these "guarantee clauses" not to express the parties' intent to discontinue lifetime benefits but rather to protect mine workers from a reduction in benefit __level__ during the term of the agreement. __See__ __Eastern Enters. v. Apfel__, 524 U.S. 498, 510 (1998) ("To ensure the Benefit Plans' solvency, the 1978 NBCWA included a 'guarantee' clause obligating signatories to make sufficient contributions to __maintain benefits__ __during that agreement__ . . . ." (emphasis added)); __Hudson__, 178 F.3d at 654 ("The

'guarantee' clause obligated signatories to make sufficient contributions to maintain benefits at the negotiated <u>levels</u> during the period of the agreement, whereas before there had been no promise to maintain any particular benefit level." (emphasis added)).  How unreasonable it would be to now interpret this language as divesting retirees from lifetime benefits.

Second, the Order and Judgment notes that the parties retained language that is substantially identical to the language in article XX, § (c)(3)(i) of the 1978, 1981, 1984, and 1988 NBCWAs—which has been interpreted as relieving individual employers from the responsibility of paying its retirees health benefits beyond the expiration of the relevant NBCWA.  <u>See</u> <u>Dist. 29, United Mine Workers v. Royal Coal Co.</u>, 768 F.2d 588, 592 (4th Cir. 1985); <u>Nobel</u>, 720 F. Supp. at 1179–80.  Thus, the majority reasons, because the 1993 Agreement between Basin and the Union retains similar durational language, there is evidence that the parties intended to incorporate such interpretations.  I disagree with the majority's conclusion that the parties' retention of this language might evidence their intent to relieve Basin from the burden of paying its retirees lifetime health benefits.

It is true that previous NBCWAs have been interpreted to relieve individual employers of the obligation to pay lifetime benefits to retirees who were guaranteed lifetime benefits in the same agreement.  <u>See</u> <u>Royal</u>, 758 F.2d at 592;

-5-

Nobel, 720 F. Supp. at 1179–80. As the majority points out, federal courts reconciled this apparent ambiguity by concluding that the 1974 Benefit Plan, a fund created by the 1974 NBCWA and contributed to by members of the Bituminous Coal Operators' Association, bore the responsibility for paying retiree lifetime benefits. Courts never swayed from the conclusion that the relevant NBCWAs guaranteed lifetime benefits; the only question was who would pay the cost. Dealing with this issue, courts determined that the 1974 Benefit Plan would bear the cost. See Nobel, 720 F. Supp. at 1179–80.

Congress enacted the Coal Act in 1992 in response to the looming insolvency of the Benefit Plan and growing concern by coal miners that their expectations of lifetime benefits were in jeopardy. Pursuant to the Coal Act, any NBCWA signatory was responsible for paying for the lifetime health benefits of its own retirees who retired prior to September 30, 1994. 26 U.S.C. §§ 9711, 9712. However, it became unclear who would pay the lifetime benefits of retirees who did not fall within the scope of the Act. The 1993 NBCWA clarified the issue of who was responsible to pay the lifetime benefits of new retirees by inserting the following paragraph into the general description: "The parties expressly agree that the language references to 'for life' and 'until death' that are retained in this General Description are intended to mean that each Employer will provide, for life, only the benefits of its own eligible retirees . . . . " (2

-6-

Appellant's App. at 482 (emphasis added).) This paragraph's purpose was to make clear that the _employer_ would bear the onus of paying lifetime benefits to its own eligible retirees. Basin and the Union inserted a substantially identical paragraph in their agreement with the only difference being the deletion of the words "for life." This omission does not by itself create a material issue of genuine fact to be resolved by trial. Inclusion of this paragraph without the words "for life" still serves the purpose it did in the 1993 NBCWA, clarifying that the employer, Basin, will in fact be responsible for providing benefits to its eligible retirees. In other sections of Appendix C discussed above, Basin guarantees health benefits "for life" and "until death," and in this section the parties simply make clear that Basin bears that responsibility for eligible retirees.

Basin indisputably knew that previous NBCWAs guaranteed lifetime benefits to coal-industry retirees. If Basin intended to discontinue this guarantee and limit benefits to the term of the agreement, why would it choose to retain the explicit language "for life" and "until death"? By retaining language from previous NBCWAs that guaranteed lifetime benefits, and using language from the 1993 NBCWA that placed the cost of benefits on employers, Basin did not effectively alter this lifetime guarantee.

Finally, the majority concludes that Basin's and the Union's bargaining notes show that they did not agree to provide lifetime benefits for retirees, and

that they perhaps agreed to make lifetime benefits the subject of mandatory negotiation upon expiration of the 1993 Agreement. There is no language in the contract that can reasonably be read to convey such an agreement. Even viewing the 1993 Agreement in the context of this purported negotiating history, a jury verdict making a finding that the 1993 Agreement makes such a promise could not survive a motion for judgment as a matter of law.

Reading the 1993 Agreement in the context described by the district court, I see no other reasonable interpretation of the contract than one that recognizes lifetime benefits. In sum, the 1993 Agreement cannot be construed in a manner consistent with Basin's position. As such, there are no genuine issues of material fact to be decided by trial and the district court correctly granted summary judgment in favor of the plaintiffs.